**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| XAVIER MORIN,<br>Plaintiff,<br><br>v.<br><br>QUINSIGAMOND COMMUNITY COLLEGE, et al.,<br>Defendants. | ) | **CIVIL ACTION NO. 25-10968-MRG** |

**REPORT AND RECOMMENDATION**

**August 25, 2026**

Hennessy, M.J.

By Order of Reference dated December 5, 2025, pursuant to 28 U.S.C. § 636(b)(1)(B) [Dkt. No. 98], this matter was referred to me for a report and recommendation on Defendants, Quinsigamond Community College ("QCC"), Maureen Ricotta, Pat Schmohl, and Margaret Yoder's Motion to Dismiss Plaintiff, Xavier Morin's, Second Amended Complaint in its entirety. [Dkt. No. 96]. Morin has filed an opposition to the motion. [Dkt. No. 99]. This matter is now ripe for adjudication. For the reasons that follow, I recommend that the motion to dismiss be allowed in its entirety.

## I. BACKGROUND[1]

### A. Morin's Enrollment and QCC's Failure to Provide Him with Accommodations

Morin was enrolled in the Practical Nursing Program at QCC from September 4, 2019 to November 15, 2020. [Dkt. No. 93 at ¶ 2]. He received mandated testing accommodations to address diagnoses of Anxiety, Dyslexia, and Attention-Deficit Hyperactivity Disorder ("ADHD"). Id. at ¶¶ 6, 10. Morin excelled in the Practical Nursing Program until March 2020 when QCC adopted COVID-19 restrictions and transitioned to virtual classes. Id. at ¶¶ 7, 9. In the midst of such restrictions, Maureen Ricotta and Margaret Yoder, Professors and Coordinators of the Practical Nursing Program, failed to provide Morin with his mandated testing accommodations, including extra time. Id. at ¶¶ 4-5, 9-10; see also id. at ¶¶ 14-16 (accommodations were not provided for Morin to take his pharmacology exam; when Morin refused to start the exam without his accommodations, Ricotta said, "When working as a nurse in the field you won't be allotted extra time."). Morin's grades declined. Id. at ¶ 10.

On May 18, 2020, Morin signed out of class without prior notice to drive his grandmother to urgent care. Id. at ¶¶ 21-24. Morin later called Ricotta, explaining that he had left to take his grandmother to urgent care and offering to produce a doctor's note as proof. Id. Ricotta dismissed the explanation and placed Morin on academic probation for leaving class without notification. Id.

### B. QCC's Dismissal of Morin from the Practical Nursing Program

On May 20, 2020, Morin received his graduation materials and QCC listed him as a graduate during its virtual graduation ceremony. Id. at ¶ 25. However, on June 3, 2020, Ricotta

[1] The following facts are taken from Morin's Second Amended Complaint. See [Dkt. No. 93].

dismissed Morin from the program via email, citing inadequate completion of ATI[2] practice exams. Id. at ¶ 26. Prior to Morin's dismissal, no faculty members had indicated to Morin that incomplete ATI exams jeopardized his program standing. Id. Morin responded that he had passed all his course examinations and the program syllabus did not list ATI practice exams as a Practical Nursing Program requirement. Id. at ¶¶ 27-28. Morin also retained counsel. Id. at ¶ 29.

### C. Morin Complains of Improper Dismissal

The following day, Morin raised his dismissal with Sara Simms, Affirmative Action Officer, and Liz Woods, Dean of Compliance and Education. Id. at ¶ 30. They acknowledged that the ATI practice exams were not Practical Nursing Program requirements. Id. at ¶ 31. Simms later reported to Morin that unfinished ATI practice exams were not grounds for dismissal, and that the dismissal would be rescinded following a grievance meeting with Morin, Yoder, and Ricotta. Id. at ¶ 33. The improper dismissal disqualified Morin from attending two clinical days on June 4 and June 9, 2020, thereby disrupting his clinical progression and jeopardizing his academic standing in the program. Id. at ¶ 32.

At the June 10, 2020 grievance meeting, Morin, Yoder, and Ricotta agreed that Morin would complete the remaining ATI practice exams and make up the two missed clinical days by Monday June 15, 2020. Id. at ¶¶ 36-37. Morin did so and paid for the make-up clinical days.[3] Id. at ¶¶ 38-39.

[2] Morin's Second Amended Complaint does not define "ATI," but it appears to reference the "Assessment Technologies Institute," an online platform and testing service nursing schools nationally use to prepare students for the NCLEX licensing exam. See ATI, www.atitesting.com (last visited Aug. 20, 2026).

[3] Morin's Second Amended Complaints states that out-of-pocket payment was not required of other similarly situated students, but it is unclear whether similarly situated means students participating in their normal clinical days or students participating in make-up clinical days. [Dkt. No. 93 at ¶ 36].

On June 15, 2020, Morin took the final exam in PNP 240, – the final course in the Practical Nursing Program – achieving a score of 92.5% and a final course grade of 89.4%. Id. at ¶ 40. Despite this, Yoder and Ricotta attempted another dismissal, alleging "poor performance" as reflected in the incomplete ATI exams. Id. at ¶ 41. When Morin tried to log into QCC's academic website to check his coursework records, he discovered that the site was inaccessible and appeared to be temporarily disabled.[4] Id. at ¶¶ 42-43.

### D. Morin's Internal Complaint

On June 16, 2020, Morin filed an affirmative action discrimination complaint with QCC's HR department against Yoder and Ricotta. Id. at ¶ 44. On July 15, 2020, Simms and Woods informed Morin that an internal investigation found that Yoder and Ricotta had mishandled Morin's disability accommodations. Id. at ¶ 45. Simms and Woods also directed Yoder and Ricotta to cease the improper practice of dismissing students for unfinished ATI practice exams, and assured Morin that he had been neither dismissed from nor failed the Practical Nursing Program, specifying that his final grade in PNP-240 was properly recorded as "IC" (Incomplete), not "F" (Failure). Id. at ¶ 46-47. Simms and Woods said if Morin completed the three outstanding ATI practice exams by November 15, 2020, QCC would issue Morin's final grade. Id. at ¶ 48. Morin completed the exams on September 17, 2020. Id. at ¶ 49.

### E. Morin is Unable to Register for the NCLEX Exam

Between late September and late December 2020, Morin struggled unsuccessfully to register for the NCLEX exam. Id. at ¶¶ 49-55. Morin emailed and called Yoder a number of times to obtain the class registration code for the exam, but Yoder did not respond. Id. Morin's

[4] Morin contends that "[t]he timing of this outage – occurring immediately after Defendants' poor performance accusation – raises a reasonable inference of either deliberate interference or negligent maintenance by QCC, both of which materially impaired Plaintiff's ability to meet the alleged requirement." Id. at ¶ 43.

PNP-240 grade also remained unchanged despite his completion of the ATI practice exams. Id. at ¶¶ 49, 51.

### F. Morin's Medical Treatment and Attempted Reentry to Nursing

From January 2021 through June 2022, Morin underwent intensive treatment for a previously diagnosed medical condition; this materially limited his ability to pursue matters with QCC. Id. at ¶ 56.

On or about June 1, 2022, Morin entered remission for his medical condition and, believing there were no outstanding academic matters remaining with QCC, began preparing for his professional licensure and reentry into the nursing field. Id. at ¶ 57. Between September 5, 2022 and January 20, 2023, Morin retained a NCLEX preparation tutor, incurring a total cost of $4,500. Id. at ¶ 58. Morin asserts that "[t]hese efforts were undertaken in reasonable reliance on the belief that his academic record at QCC was complete and that he was eligible to pursue licensure as a Practical Nurse." Id.

On January 21, 2024, Morin paid the NCLEX exam fee and forwarded an email from the Massachusetts Board of Registration in Nursing to QCC formally requesting that QCC transmit his Practical Nursing Certificate and academic transcript. Id. at ¶¶ 59-60. Five days later, Pat Schmohl, Dean of School of Healthcare for the Practical Nursing Program, informed Morin that his final grade in PNP-240 had been changed from an "Incomplete" to a "Fail," citing alleged non-completion of ATI requirements by the November 2020 deadline. Id. at ¶ 61. Morin responded with confirmation that he had completed the required exams by September 17, 2020. Id. at ¶ 62.

Schmohl investigated the discrepancy and, in early June 2023, he concluded that QCC had been at fault for failing to change Morin's grade after Morin completed the ATI practice

exams. Id. at ¶¶ 63-65. Despite acknowledging that QCC was at fault for this "oversight," Schmohl asserted that Morin had "failed out" of the program due to ATI-related issues. Id. at ¶¶ 64-66. He also criticized Morin for not timely contacting QCC, stating "[e]ven with health issues, you still should have found the time to reach out to us." Id. at ¶ 67. Schmohl informed Morin that QCC would not amend his final grade in PNP-240 or issue his Practical Nursing Certificate. Id. at ¶ 69. Instead, QCC offered two restitution options to redress the situation, despite QCC's acknowledgement that its error led to the failure to change Morin's grade and graduate him. Id. The options required Morin to either repeat coursework he had already completed or incur new debt. Id. Morin expressed dissatisfaction with the "restitution options" and declined to accept either offer. Id. at ¶¶ 73, 77.

On July 11, 2023, Morin scored 62% on the TEAS exam, exceeding the 60% minimum score for consideration for admission to QCC's Practical Nursing Program and within the qualifying range for consideration in QCC's Registered Nurse ("RN") program. Id. at ¶ 78-79. However, on July 13, 2023, Schmohl emailed Morin that he "did not meet the requirements for entrance into the RN program." Id. at ¶ 80. This contradicted QCC's published TEAS admission criteria, which stated that a score within the 60-64% range qualified an applicant for consideration. Id.

On November 6, 2023, Morin met with QCC in a final effort to obtain his Practical Nursing Certificate before pursuing legal remedies. Id. at ¶¶ 83, 85. Again, Schmohl steered Morin toward the RN option that QCC outlined in June 2023 and explained that to enroll in that program for Fall 2024, Morin would have to complete Anatomy and Physiology 101 and retake the TEAS test. Id. at ¶ 86. Morin did not agree to anything at the November 6, 2023 meeting. Id. at ¶ 87.

In January 2024, Morin arranged a payment plan for $1,301.15 to take Anatomy and Physiology 101 at QCC and paid $178.49 for the course book. Id. at ¶ 89. On February 7, 2024, Morin paid $129.00 to take the TEAS examination. Id. at ¶ 90. On March 1, 2024, Morin scored a 65.3% on the TEAS examination, a result that exceeded the minimum requirement for both the Licensed Practical Nurse ("LPN") and RN programs at QCC. Id. at ¶ 91. On or about May 20, 2024, QCC unilaterally enrolled Morin in Anatomy and Physiology 102 without his knowledge or consent, triggering tuition obligations that he did not agree to incur. Id. at ¶ 95.

### G. Morin Retains Counsel and Proposes His Own Restitution Options

On April 16, 2024, Morin retained Attorney David J. Grimaldi to negotiate with QCC, paying a $5,000 retainer. Id. at ¶ 92. On or about June 30, 2024, Morin presented three settlement options to QCC:

- Morin would retake the final LPN course and, upon successful completion, QCC would issue the Practical Nursing Certificate.
- Morin would enroll in NUR 108, a higher-level nursing course beyond the LPN curriculum, after which QCC would confer the Practical Nursing Certificate and allow continuation in the LPN-to-RN Bridge Program.
- QCC would issue a cash settlement of $20,500, representing reimbursement for outstanding student-loan obligations and related educational losses.

Id. at ¶ 96. Between July 1 and August 30, 2024, Grimaldi made multiple attempts to negotiate a settlement with QCC's General Counsel. Id. at ¶ 97. Throughout this period, QCC continued to engage in unilateral and retaliatory conduct, including but not limited to, enrolling Morin in the RN Program without his consent. Id. at ¶¶ 97-98.

On August 21, 2024, Grimaldi discussed the possibility of Morin retaking PNP-240 to allow QCC to release his Practical Nursing Certificate. Id. at ¶ 99. QCC responded that it was possible but that Morin should attend the first day of the RN program. Id. Morin did not attend. Id. at ¶ 101.

On October 23, 2024, QCC offered Morin a $7,500 cash settlement. Id. at ¶ 105. QCC also stated that the prior offer to allow Morin to retake the LPN program was "no longer available," but QCC would still extend Morin priority admission to the RN Program beginning in Spring 2025. Id. QCC then revised the offer to be a cash settlement of $5,500 with a $1,300 deduction representing an "outstanding balance" for Anatomy & Physiology 102 – a course which Morin did not register for or attend. Id. at ¶ 109. The offer required that Morin choose between the cash settlement and priority entrance into QCC's RN Program. Id. at ¶ 110.

On January 31, 2025, Morin issued a formal demand letter to QCC, requesting that QCC confer his Practical Nursing Program Certificate and amend his final grade in PNP-240 to a B+, consistent with his completed coursework and prior faculty assurances. Id. at ¶ 112. On March 3, 2025, QCC communicated to Morin that it would not amend his final grade or issue his Practical Nursing Certificate. Id. at ¶ 115. QCC confirmed that its $5,500 cash settlement offer was still on the table but withdrew the offer for priority placement into the RN program. Id. Morin's only option was to retake the LPN program in its entirety. Id.

**H. QCC Improperly Bills Morin for Enrollment in Anatomy & Physiology 102**

On December 5, 2024, QCC issued a pre-collection bill for Anatomy & Physiology 102 despite Morin never enrolling in or attending the course. Id. at ¶ 111. When Morin disputed the charge, the account was referred to collection, causing him financial and reputational harm. Id. Morin alleges that more fraudulent billing statements were issued on June 8, 2025, and July 13, 2025. Id. at ¶ 121. QCC ignored Morin's August 21, 2025 complaint of these fraudulent billing statements. Id. at ¶ 122. On August 28, 2025, QCC issued Morin another billing statement. Id. at ¶ 123. After receiving the August 28, 2025 billing statement, Morin filed a formal complaint with the Massachusetts Department of Higher Education ("DHE") alleging billing misconduct

and administrative retaliation. Id. at ¶ 124. On September 9, 2025, the DHE directed QCC to review the allegations and take corrective action. Id. at ¶ 125. Morin alleges that improper billing and referrals for collection were part of QCC's ongoing retaliation against him. Id. at ¶¶ 111, 120.

On April 4, 2025, the Office of the State Auditor released Audit Report No. 2023-QCC-01 for QCC covering the period from March 1, 2020 through June 30, 2023, which found that the College "lacked adequate internal controls over student account billing and course-record maintenance." Id. at ¶ 118. Morin claims the Audit Report corroborates his allegations that QCC mis-graded his work in PNP-240, enrolled him in Anatomy & Physiology 102 without authorization, and improperly billed his account for that class. Id. at ¶ 119.

## II. STANDARD OF REVIEW

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007). "Under Rule 12(b)(6), the district court may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008)).

To survive a motion to dismiss, a plaintiff must "state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (internal citations

omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556). Despite this generous standard, "Rule 12(b)(6) is not entirely a toothless tiger . . . [t]he threshold for stating a claim may be low, but it is real." Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989) (quotation omitted). The complaint must therefore "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988); see DM Research, Inc. v. Coll. Of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999) (explaining that the complaint must "allege a factual predicate concrete enough to warrant further proceedings").

Although the complaint need not provide "detailed factual allegations," Twombly, 550 U.S. at 555, it must "amplify a claim with some factual allegations . . . to render the claim plausible," Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

## III. THE ELEVENTH AMENDMENT

The Eleventh Amendment to the United States Constitution states "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. Thus, "the Eleventh Amendment prohibits federal courts from hearing cases brought against states or their officers under state law." Lynch v. Massachusetts State Senate, 495 F. Supp. 2d 175, 179 (D. Mass. 2007); see also Maysonet-Robles v. Cabrero, 323 F.3d 43, 48 (1st Cir. 2003) ("Long interpreted as an affirmation of

state sovereign immunity[,]" the Eleventh Amendment "(despite its literal text) also bar[s] a citizen from bringing a federal court action against his or her own State."). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001).

"Public universities 'usually are considered arms of the [S]tate.'" Telfor v. Bunker Hill Community College, 2017 WL 2837005, at *2 (quoting U.S. v. Univ. of Mass., Worcester, 812 F.3d 35, 40 (1st Cir. 2016)). "[W]ith respect to Massachusetts state universities and colleges, every court presented with the issue has concluded or assumed without issue that the state university or college at issue was a state agency for purposes of the Eleventh Amendment." Taite v. Bridgewater State University, 236 F. Supp. 3d 466, 475 (D. Mass. 2017) (citing Univ. of Mass., Worcester, 812 F.3d at 40; Univ. of Mass. v. Robl, No. 04-11013-RGS, 2004 WL 1725418, at *2 (D. Mass. Aug. 2, 2004); Shocrylas v. Worcester State College, No. 06-40278-FDS, 2007 WL 3332818, at *6 (D. Mass. Oct. 29, 2007)). "Although every school 'must be evaluated in light of its unique characteristics,'" I find that the weight of the authority and the reasoning in cases holding that public universities are an arm of the state and immune from suit in federal court are persuasive. See Telfort, 2017 WL 2837005, at *2 (quoting Irizarry-Mora v. Univ. of P.R., 647 F.3d 9, 14 (1st Cir. 2011)). Similarly, because Yoder, Ricotta, and Schmohl are sued in their official capacities, they are also immune from suit under the Eleventh Amendment.[5] See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984); Mills v. State of Maine, 118 F.3d 37, 54 (1st Cir. 1997) (Eleventh Amendment immunity also applies to state officials sued in their official capacities).

[5] "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" Pennhurst, 465 U.S. at 101 (quoting Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 464 (1945)). "Thus, '[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.'" Id. (quoting Hawaii v. Gordon, 373 U.S. 57, 58 (1963)).

"There are two exceptions to Eleventh Amendment immunity: state waiver and Congressional abrogation." Cichocki v. Mass. Bay Community College, 199 F. Supp. 3d 431, 438 (D. Mass. 2016) (citing Kentucky v. Graham, 473 U.S. 159, 167 n. 14 (1985)); see also Centro de Periodismo Investigativo, Inc. v. Financial Oversight and Management Board for P.R., 35 F.4th 1, 15 (1st Cir. 2022) (stating that "the Eleventh Amendment shield is not impenetrable" and "[s]overeign immunity is a privilege which the holder of the immunity can voluntarily waive."). "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, [the Supreme Court] will find waiver only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." Cichocki, 199 F. Supp. 3d at 438 (quoting Edelman v. Jordan, 415 U.S. 651, 673 (1974)). As the Court observed elsewhere, "[t]he test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment... 'a State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued.'" Pennhurst, 465 U.S. at 99. Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985). As for Congressional abrogation, "Congress may abrogate the States' constitutionally secured immunity from suit in federal court ... by making its intention unmistakably clear in the language of the statute[.]" Centro de Periodismo Investigativo, Inc., 35 F.4th at 15 (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000)). Additionally,

Congressional abrogation must be made pursuant to a valid grant of constitutional authority. See Allen v. Cooper, 589 U.S. 248, 255 (2020).

Having found that QCC is an arm of the state for Eleventh Amendment purposes, I consider whether Morin's claims fall within one of the exceptions for Eleventh Amendment immunity. As discussed below, Defendants are immune under the Eleventh Amendment for all claims except Disability Discrimination alleged in Count II, Retaliation alleged in Count III, and Count Four insofar as it alleges a violation of the Higher Education Act ("HEA").

## IV. QCC AND ITS FACULTY ARE IMMUNE FROM SUIT IN FEDERAL COURT ON MORIN'S CONTRACT-RELATED CLAIMS

Morin brings four contract-related claims. In Count I, Morin claims QCC breached the contract between it and him to graduate him upon his fulfillment of Practical Nurse Program academic and clinical requirements. [Dkt. No. 93 at Count I, ¶¶ 1-13]. Specifically, Morin claims that Ricotta and Yoder "were contractually obligated, per the PNP-240 course syllabus, to assign Plaintiff a final grade of B+ upon completion of his final exam and coursework." Id. at Count I, ¶ 7.

In Count VI, Morin claims that QCC was unjustly enriched by "retaining the financial benefit of his tuition and federal aid while refusing to deliver the educational credential purchased." Id. at Count VI, ¶¶ 6-7. Morin further alleges that QCC "compounded [its] enrichment by issuing fraudulent billing statements and initiating collection efforts for courses which Morin neither registered nor attended, in an effort to extract additional funds." Id. at Count VI, ¶ 9.

In Count VII Morin alleges that QCC made promises to him upon which he reasonably relied to his detriment. Id. at Count VIII, ¶¶ 3-7. Specifically, Morin claims that QCC represented: that completion of all required coursework and ATI practice exams would result in

the issuance of his Practical Nursing Certificate; that ATI practice exams were not mandatory for course or program completion; that he would be eligible for priority admission to the RN Program upon achieving a qualifying TEAS score; and, that tuition and loan payments would secure completion of an accredited program free from discrimination or arbitrary grading practices. Id. at Count VIII, ¶ 3. Morin asserts that as a direct and proximate result of his reliance on QCC's misrepresentations, he has suffered emotional distress, reputational harm, lost professional and educational opportunities, financial loss, and student-loan obligations exceeding $22,000. Id. at Count VIII, ¶ 7.

Lastly among contract-related claims, Morin alleges that he entered into a contract with QCC when he enrolled in its Practical Nursing Program and that QCC breached the implied covenant of good faith and fair dealing present in every contract by engaging in conduct designed to frustrate Morin's contractual rights and defeat the reasonable expectations arising therefrom. Id. at Count IX, ¶¶ 3, 5.

QCC and the individual defendants are immune from suit for each of these contract-related claims. M.G.L. c. 258, § 12 states that "[c]laims against the commonwealth, except as otherwise expressly provided in this chapter or by any general or special provision of law, may be enforced in the superior court." M.G.L. c. 258, § 12. The Supreme Judicial Court ("SJC") has stated that "[a]pplying [its] rules governing statutory waiver of governmental immunity, [it] find[s] in the terms of G.L. c. 258, neither an express nor a necessarily implicit consent by the Commonwealth to suit in Federal courts." Irwin v. Comm'r of Dep't of Youth Servs., 388 Mass. 810, 819 (Mass. 1983). Thus, "[i]t appears that Massachusetts has not consented to suit in federal court for contract claims." McGuigan v. Conte, 629 F. Supp. 2d 76, 83 (D. Mass. 2009); see also M.G.L. c. 258, § 3 ("The superior court shall have jurisdiction of all civil actions

brought against a public employer."); BT INS, Inc. v. Univ. of Mass., 2010 WL 4179678, at *4 ("[T]here is no evidence that Massachusetts's general waiver of immunity for contract claims extends to the Eleventh Amendment's protections against suit in federal court."); see also Atascadero, 473 U.S. at 241 (internal citations omitted) ("Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment. [A] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued.") (emphasis in original). Consistent with Massachusetts' limited waiver of Eleventh Amendment immunity for contract claims in state court, federal courts have repeatedly held that Massachusetts has not consented to suit in federal court for claims of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment. See BT INS, Inc., 2010 WL 4179678, at *1, *3 (breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel); Surprenant v. Mass. Tpk. Auth., 768 F. Supp. 2d 312, 319 (D. Mass. 2011) (unjust enrichment); Brodeur v. Massachusetts, No. 17-cv-445-PB, 2017 WL 6550878, at *3 (D.N.H. Oct. 26, 2017), report and recommendation adopted, No. 17-cv-445-PB, 2018 WL 1718340 (D.N.H. Apr. 9, 2018) (unjust enrichment). Accordingly, I recommend that Morin's contract claims set forth in Counts I, VI, VIII, and IX be dismissed as Defendants are immune from suit in federal court.

## V. MORIN'S MASSACHUSETTS CIVIL RIGHTS ACT ("MCRA") CLAIM

In Count V, Morin alleges that QCC's conduct violates the MCRA's prohibition on interference with the exercise or enjoyment of rights secured by the Constitution or laws of the United States or of the Commonwealth by "threats, intimidation, or coercion." [Dkt. No. 93 at Count V, ¶ 2]. Specifically, Morin claims that QCC violated his right to be free from disability

discrimination under the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101), the Rehabilitation Act (29 U.S.C. § 794), and M.G.L. c. 151B, as well as his right to be free from discrimination and unequal treatment under the Fourteenth Amendment, Articles 1 and 10 of the Massachusetts Declaration of Rights, and his right to contractual benefits and fair treatment arising from his enrollment in, and completion of, QCC's Practical Nursing Program.

The MCRA prohibits "any person or persons, whether or not acting under color of law, [from] interfere[ing] by threats, intimidation or coercion, or attempt[ing] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth[.]" M.G.L. c. 12, § 11H(a)(1); see M.G.L. c. 12 § 11I (granting private right of action). The MCRA is the Commonwealth's analogue to 42 U.S.C. § 1983. Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011).[6] It is well established that § 1983 does not abrogate a state's Eleventh Amendment immunity. Santiago v. Keyes, 839 F. Supp. 2d 421, 427 (D. Mass. 2012) (citing Quern v. Jordan, 440 U.S. 332, 341-42 (1979)). In Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Following the Supreme Court's decision in Will, Massachusetts state courts "have invariably held that they 'should reach the same result under the State Civil Rights Act,' and have determined that 'the Commonwealth is not a "person" for purposes of c. 12, §§ 11H and 11I.'" Santiago, 839 F. Supp. 2d at 428 (internal citations omitted) (citing Commonwealth v. ELM Med. Lab., Inc., 33 Mass. App. Ct.

[6] The MCRA differs from § 1983 in two significant ways. See Nolan, 656 F.3d at 76. First, the MCRA is broader than § 1983 in that it reaches private conduct and does not require that the offending conduct was committed as part of State action. See id. Second, the MCRA is narrower than § 1983 in that it limits its remedy to conduct that interferes with a secured right "by threats, intimidation, or coercion." See id. (citing M.G.L. c. 12, § 11H and Sena v. Commonwealth, 417 Mass. 250, 262 (Mass. 1994)).

71, 76 (Mass. App. Ct. 1992)). The Commonwealth's sovereign immunity from suit under the MCRA extends to its agencies. See Isijola v. Grasso, 768 F. Supp. 3d 166, 178; Williams v. O'Brien, 78 Mass. App. Ct. 169, 173 (Mass. App. Ct. 2010).

Because it is settled that QCC is an arm of the state to which the Eleventh Amendment's sovereign immunity applies and there is no waiver of that immunity under the MCRA, nor abrogation under Section 1983, I recommend that QCC's motion to dismiss Count V be granted.

## VI. THE ELEVENTH AMENDMENT BARS MORIN'S TORT CLAIMS

In Count IV, Morin alleges fraudulent inducement and misrepresentation. He alleges that he had a protected interest in truthful, accurate, and non-deceptive representations concerning his academic record, enrollment status, and financial obligations. [Dkt. No. 93, Count IV at ¶¶ 2-3]. Specifically, Morin claims that, despite his completion of all required coursework, his grade in PNP-240 was recorded as an "F" and that Defendants were aware that the failing grade was inaccurate, but "deliberately maintained the inaccurate entry to deprive Plaintiff of his program certificate and obstruct his eligibility for state licensure." Id. at Count IV, ¶¶ 4-5. Additionally, Defendants enrolled Morin in Anatomy & Physiology 102 without his consent, causing him to be issued bills and to have his account referred for collection throughout 2024 and 2025. Id. at Count IV, ¶ 6.

In Count VII, Morin alleges that Defendants breached the duty of care that an institution of higher education owes to its students to exercise reasonable care in maintaining accurate academic and financial records, provide truthful information, and safeguard students from foreseeable harm, by failing to award him a passing grade in PNP-240 consistent with his completion of work in accordance with the syllabus, issuing false or misleading billing statements for enrollment in Anatomy & Physiology 102, neglecting to verify the accuracy of

institutional records prior to certifying federal Title VII funding and student-loan data, providing false or incomplete information to him and outside agencies regarding his enrollment and completion status, and failing to implement mandated academic and medical accommodations. Id. at Count VII, ¶¶ 2-4.

As noted previously, "[a] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." Pennhurst, 465 U.S. at 99 (emphasis in original). "As a result, a state may waive its sovereign immunity against suits in state court while maintaining its sovereign immunity against the same suits in federal court. A state's general waiver of sovereign immunity has precisely this effect." Rivera v. Com. of Mass., 16 F. Supp. 2d 84, 87 (citing Atascadero, 473 U.S. 234, 237 (1985)). M.G.L. c. 258, otherwise known as the Massachusetts Tort Claims Act ("MTCA"), provides that "[p]ublic employers shall be liable ... in the same manner and to the same extent as a private individual.... The superior court shall have jurisdiction of all civil actions brought against a public employer." M.G.L. c. 258, §§ 2, 3. After adoption of the MTCA, this Court in Irwin v. Calhoun, 522 F. Supp. 576, 578 (D. Mass. 1981) (Garrity, J.), certified the following question to the SJC: "Does Massachusetts General Laws Chapter 258 by its terms, either expressly or impliedly, indicate the Commonwealth's consent to suit by citizens in federal as well as state courts, thereby waiving its eleventh amendment immunity?" Irwin, 388 Mass. at 811. The SJC responded in the negative. Id. "Therefore, even if the stringent standard of Atascadero did not apply, no waiver of Eleventh Amendment immunity could be found as to the Massachusetts Tort Claims Act." Rivera, 16 F. Supp. 2d at 88.

The fact that Morin's Count IV also alleges intentional conduct does not change the result. Indeed, the Commonwealth's waiver of immunity from suit in state court encompassed in

the MTCA, does not apply to intentional torts. M.G.L. c. 258, § 10(c) (the MTCA does not apply to "any claim arising out of an intentional tort, including…misrepresentation, [or] deceit[.]"); see also Pisarczyk v. Lynch, 98 Mass. App. Ct. 1116, 2020 WL 6326302, at *2 (Oct. 29, 2020) ("[F]raud claims against the public entities are barred by the … MTCA[.]"). As the MTCA does not waive the Commonwealth's immunity for intentional tort claims prosecuted in state court, it follows that it does not waive immunity for intentional torts brought in federal court. See Isijola, 768 F. Supp. 3d at 177 ("The Commonwealth has not waived its immunity for claims of intentional torts nor from tort suits in federal court[.]"); see also Canales v. Gatzunis, 979 F. Supp. 2d 164, 173-74 (D. Mass. 2013) ("The Commonwealth did not waive its Eleventh Amendment immunity in federal court by enacting the MTCA."); Rivera, 16 F. Supp. 2d at 87 ("The Commonwealth has expressly exercised its prerogative to waive its sovereign immunity only insofar as claims are brought against it in its own judicial fora.").

For the foregoing reasons, Counts IV and VII are barred by Eleventh Amendment immunity.[7]

## VII. MORIN'S CLAIMS UNDER THE FALSE CLAIMS ACT ("FCA") AND THE HIGHER EDUCATION ACT ("HEA")

As discussed above, Morin brings a common law claim for fraudulent inducement and misrepresentation. Based on the same allegations, Morin also alleges violations of 31 U.S.C. §§

[7] As argued by Defendants, apart from an Eleventh Amendment Bar, Morin's tort claims fail for a failure to plead presentment. Pursuant to M.G.L. c. 258, § 4, "a claimant must, prior to instituting an action against a public employer on a claim for damages, present his claim in writing to the appropriate executive officer of the public employer." Rodriguez v. City of Somerville, 472 Mass. 1008, 1010 (Mass. 2015). "Because proper presentment is a condition precedent, [Mass. R. Civ. P. 9(c)] requires the plaintiff to plead performance of the condition in his complaint." Id. at 1010 n. 3; Mass. R. Civ. P. 9(c) (stating that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity."). Morin has not pleaded compliance with this condition precedent. See [Dkt. No. 93].[7] Thus, because Morin has not complied with M.G.L. c. 258 nor with Mass. R. Civ. P. 9(c)'s requirement that compliance with its presentment condition be pleaded, this constitutes a separate ground for dismissal.

3729-3733, the False Claims Act ("FCA") and 20 U.S.C. §§ 1001 et seq., the Higher Education Act ("HEA"). See [Dkt. No. 93 at Count IV].

Morin's claim against QCC under the FCA cannot be maintained for two reasons. First, the Commonwealth, its agencies, and agents are immune under the Eleventh Amendment. Second, as to both the FCA and the HEA, Morin fails to state a claim upon which relief can be granted.

QCC, Ricotta, Yoder, and Schmohl all have Eleventh Amendment immunity from suit under the FCA and the HEA. As noted, the Eleventh Amendment grants immunity to state agencies and state officials sued in their official capacities from suit in federal court unless that immunity has been either waived by the state or abrogated by Congress. The Commonwealth has not waived and Congress has not abrogated immunity from suit in federal court for FCA claims. See Harihar v. U.S. Bank National Association, 2017 WL 1227924, at *14 (D. Mass. Mar. 31, 2017) (citing cases), aff'd sub. nom. Harihar v. U.S. Bank N.A., No. 17-1381, 2018 WL 7360636 (1st Cir. Aug. 7, 2018). Similarly, a review of the HEA does not reveal any apparent abrogation of Eleventh Amendment immunity as to that statute. See 20 U.S.C. § 1001 et seq. Nor is there anything to suggest that Massachusetts has waived its Eleventh Amendment immunity to suit under that title. Because waiver of Eleventh Amendment immunity will be found only where stated "by the most express language, or by such overwhelming implication from the text as would leave no room for any other reasonable construction[,]" I recommend that the Court find that there has been no abrogation nor waiver of immunity to claims brought under the HEA. Murray v. Wilson Distilling Co., 213 U.S. 151, 171 (1909). Because neither exception to Eleventh Amendment immunity applies, see Cichocki v. Mass. Bay Community College, 199 F. Supp. 3d at 438, Morin' claim for fraudulent inducement and misrepresentation

in violation of the FCA and HEA must be dismissed as the Commonwealth is immune to suit in federal court.

As to the individual Defendants, "Eleventh Amendment immunity extends to suits against state officials being sued in their official capacity[.]" Harihar, 2017 WL 1227924, at *14 (citing Graham, 473 U.S. at 166). Because Morin has named all of the individual defendants, Schmohl, Ricotta, and Yoder, in their official capacities, I recommend that his claims against them be dismissed as well as they are immune from suit in federal court under the Eleventh Amendment.

Even if Morin's claims were not barred by the Eleventh Amendment, Morin fails to state a claim under the FCA or HEA. The FCA subjects to liability "any person" who submits a false claim to the government "for payment or approval." Univ. of Mass., Worcester, 812 F.3d at 39 (citing 31 U.S.C. § 3729(a)(1)(A)). Though the FCA itself does not define the term "person," the Supreme Court has applied the longstanding interpretive presumption that "person" does not include the sovereign and has held that states are not subject to liability in actions brought by private parties under the FCA. Id. (citing Vermont Agency of Natural Resources v. U.S. ex rel. Stevens, 529 U.S. 765, 780, 787-88 (2000)). The Court has emphasized the "virtual coincidence of scope" between the question of "whether States can be sued" under the FCA and the question of "whether unconsenting States can be sued" in the Eleventh Amendment context. Id. (citing Stevens, 529 U.S. at 779-80). Every circuit that has confronted the question of how to determine whether an entity is a state agency for FCA purposes has concluded that the FCA context requires the same test as that used for determining whether an entity is an arm of the state entitled to share in Eleventh Amendment immunity. Id. (collecting cases from the Sixth, Eleventh, Fourth, Ninth, Tenth, and Fifth Circuits). The First Circuit has adopted this approach.

Id. Thus, because I have already concluded that QCC is a state agency entitled to Eleventh Amendment immunity, I similarly recommend that QCC be considered a state agency and therefore not subject to suit under the FCA.

Morin's claim under the HEA also cannot be maintained because the HEA does not provide a private cause of action. See Gibbs v. SLM Corp., 336 F. Supp. 2d 1, 14 (D. Mass. 2004). Rather, it provides for suits "brought by or against the Secretary of Education[,]" 20 U.S.C. § 1082(a)(2), and thereby "provides an enforcement scheme which gives the Secretary of Education wide-ranging regulatory authority to enforce the provisions of the HEA." Gibbs, 336 F. Supp. 2d at 14 (quoting McCulloch v. PNC Bank Inc., 298 F.3d 1217, 121 (11th Cir. 2002)). The Eleventh Circuit stated that in the twenty-five years preceding its decision in McCulloch, "nearly every court to consider the issue…has determined that there is no express or implied private right of action to enforce any of the HEA's provisions." 298 F.3d at 1221 (collecting cases). For the reasons stated above, I recommend that, Morin's FCA and HEA claims be dismissed, even if they were not barred by Eleventh Amendment immunity, because they fail to state a claim upon which relief can be granted.

## VIII. MORIN'S CLAIM FOR DECLARATORY RELIEF

### A. Count X – Declaratory Relief

In Count X, Morin brings a claim under 28 U.S.C. § 2201for declaratory relief. [Dkt. No. 93 at Count X]. Specifically, he seeks a declaratory judgment that:

a. Defendants' refusal to amend Plaintiff's final grade in PNP-240 and issue his Practical Nursing Certificate constitutes unlawful, discriminatory, and inequitable conduct under federal and state law;
b. Plaintiff has met all academic and clinical requirements necessary to be deemed a graduate of the QCC Practical Nursing Program;
c. Plaintiff is entitled to full recognition as a graduate of the QCC Practical Nursing Program with all rights, privileges, and credentials attendant thereto.

Id. at Count X, ¶ 6.

28 U.S.C. § 2201 states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

As discussed previously, QCC is an arm of the state which is afforded immunity from suit under the Eleventh Amendment. See supra Section III (citing Telfor, 2017 WL 2837005, at *2; Taite, 236 F. Supp. 3d at 475; Robl, 2004 WL 1725418, at *2; Shocrylas, 2007 WL 3332818, at *6). Similarly, because Yoder, Ricotta, and Schmohl are sued in their official capacities, the individual defendants are also immune from suit in federal court under the Eleventh Amendment. See Pennhurst, 465 U.S. at 101; Mills, 118 F.3d at 54 (Eleventh Amendment immunity also applies to state officials sued in their official capacities). Lastly, the Court has stated that "the amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a state." Pennhurst, 465 U.S. at 100-01 (citing Missouri v. Fiske, 290 U.S. 18, 27 (1933). Thus, the fact that Morin is seeking declaratory relief makes no difference in the analysis, as the jurisdictional bar of Eleventh Amendment immunity applies regardless of the type of relief sought.

Morin's claims against Defendants cannot be saved by an invocation of the Ex Parte Young doctrine. That doctrine is a "critical exception to the bar on suits in federal court against state officials." Cotto v. Campbell, 126 F.4th 761, 767 (1st Cir. 2025) (Ex Parte Young, 209 U.S. 123 (1908)). Under that exception, a federal court is permitted to "prohibit a state official

from enforcing state law in a way that violates federal law." Id. (citing Edelman, 415 U.S. at 664). The rationale behind this exception is that "state laws that conflict with the federal Constitution, for example, are 'void' and cannot 'impart to [the official] any immunity,' thereby permitting a lawsuit against a state official enforcing such a state law." Id. (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)). Thus, under Ex Parte Young, a federal court may "issue prospective relief that enjoins state officials from committing future violations of federal law, but not retrospective relief that 'make[s] reparation for the past.'" Id. (quoting Edelman, 415 U.S. at 664-65); see also id. at 767-68 (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 65, 645 (2002) ("[T]he Ex parte Young exception applies if a plaintiff (1) 'alleges an ongoing violation of federal law' by a state official and (2) 'seeks relief properly characterized as prospective.'").

Morin's claim for declaratory relief does not seek to "enjoin[] state officials from committing future violations of federal law[.]"_Id. (quoting Edelman, 415 U.S. at 664-65). The Court has explicitly stated that "officials' continued withholding of past benefits, even if wrongful, amounted to a past wrong and not an ongoing violation for Ex Parte Young purposes." Id. (citing Edelman, 415 U.S. at 655-56 and Papasan v. Allain, 478 U.S. 265 (1986)). Morin's characterization of QCC's alleged refusal to amend his final grade in PNP-240, issue his Practical Nursing Certificate, and recognize him as a graduate of the nursing program does not change the fact that these claims seek to redress officials' continued withholding of past benefits. The law is clear that such claims are to redress past wrongs and not to stop an ongoing violation. Thus, they are not excepted from Eleventh Amendment immunity by Ex Parte Young.

Further, even if Morin's declaratory judgment claim were not barred by the Eleventh Amendment, it is barred as duplicative of his other claims. As pointed out in Lambert v.

Emerald Publishing Ltd., "[t]he Supreme Court has noted that 'district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdiction prerequisites[.]'" No. 24-cv-11980-ADB, 2025 WL 2617839, at *6 (D. Mass. Sept. 10, 2025) (citing Wilton v. Seven Falls Co., 515 U.S. 77, 282 (1995)). Thus, "courts have routinely dismissed declaratory judgment claims that are merely redundant of a plaintiff's other claims[.]" Id. (quoting BASF Corp. v. Martineaus Auto Body, Inc., No. 18-cv-10881, 2019 WL 383885, at *5 (D. Mass. Jan. 30, 2019) (internal quotations omitted)). Because here Morin's claim for declaratory judgment is just a restatement of the relief he seeks under his other claims which I recommend be dismissed, I also recommend that the Court exercise its discretion and determine that this action should not be maintained under the Declaratory Judgment Act.

Accordingly, I recommend that Morin's Count X claim for declaratory relief be dismissed.

## IX. MORIN'S DISABILITY AND RETALIATION CLAIMS

Morin alleges Defendants engaged in disability discrimination, in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12132, the Rehabilitation Act 29 U.S.C. § 794, and M.G.L. c. 151B, § 4; and retaliation, in violation of the ADA and M.G.L. c. 151B § 4(4) . [Dkt. No. 93 at Counts II and III]. Defendants move to dismiss, arguing that Eleventh Amendment immunity bars the Chapter 151B claims, and the applicable statute of limitations bars the federal discrimination and retaliation claims. For the reasons stated below, I recommend that the motion to dismiss these claims grounds be granted in its entirety.

**A. Morin's M.G.L. c. 151B Discrimination and Retaliation Claims are Barred by the Eleventh Amendment.**

M.G.L. c. 151B does not contain a waiver of the state's sovereign immunity from suit in federal court on claims brought under that section. Lynch v. Massachusetts State Senate, 495 F. Supp. 2d 175, 179 (D. Mass. 2007) (dismissing state claim with prejudice); see also M.G.L. c. 151B. Thus, because QCC is an arm of the Commonwealth and Massachusetts has not waived its Eleventh Amendment immunity under M.G.L. c. 151B, Morin's discrimination (Count II) and retaliation (Count III) claims brought under that section are subject to dismissal.[8]

**B. Morin's federal discrimination and retaliation claims are not barred by the Eleventh Amendment, but must be dismissed because they have been brought outside of the applicable statute of limitations.**

As a preliminary matter, Defendants do not move to dismiss Morin's federal discrimination and retaliation claims which he has brought pursuant to the ADA and the Rehabilitation Act on Eleventh Amendment grounds, and, indeed, in this Circuit, they could not. In enacting the ADA and Rehabilitation Act, Congress expressly abrogated Eleventh Amendment immunity. In relevant part, the ADA states:

> A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202. Similarly, 42 U.S.C. § 2000d-7 provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the

[8] In addition to the fact that Massachusetts and its agents are immune from suit brought in federal court under M.G.L. c. 151B, M.G.L. c. 151B, § 4 prohibits discrimination in employment, housing, and lending. See M.G.L. c. 151B, § 4. It does not contain any provisions prohibiting or even discussing discrimination in education. See id. Thus, the anti-discrimination provisions of M.G.L. c. 151B do not address Morin's allegations.

> Rehabilitation Act of 1973…or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance. []In a suit against a State for a violation [the Rehabilitation Act], remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C. § 2000d-7. Under First Circuit law, Title's II's abrogation is constitutional as applied to cases alleging disability discrimination in public education. Toledo v. Sanchez, 454 F.3d 224 (2006). [9]

---

[9] Despite controlling First Circuit law, there is a lack of clarity regarding the constitutionality of these provisions of law. The seminal decision is Lane v. Tennessee, in which a class of paraplegics alleged that Tennessee had denied them physical access to the state's courts in violation of Title II of the ADA. 541 U.S. 509, 513 (2004). The Court concluded that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." Id. at 533-34. In doing so, however, the Court was clear that its holding was limited to cases involving the fundamental right of access to the courts:

> Petitioner urges us both to examine the broad range of Title II's applications all at once, and to treat that breadth as a mark of the law's invalidity. According to petitioner, the fact that Title II applies not only to public education and voting-booth access but also to seating at state-owned hockey rinks indicates that Title II is not appropriately tailored to serve its objectives. But nothing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole. Whatever might be said about Title II's other applications, the question presented in this case is not whether Congress can validly subject the States to private suits for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power under § 5 to enforce the constitutional right of access to the courts. Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further.

Id. at 530-31 (footnotes omitted).

Thus, post-Lane it was not a foregone conclusion that Title's II's abrogation was constitutional as applied to cases alleging disability discrimination in public education. In fact, courts in the Fourth and Fifth Circuits have found that abrogation is not constitutional in such circumstances. See McNulty v. Board of Educ. of Calvert County, 2004 WL 1554401, at *3 (D. Md. July 8, 2004); Simmang v. Texas Bd. Of Law Examiners, 346 F. Supp. 2d 847, 884 (W.D. Tex. 2004). As noted, the First Circuit, however, has found otherwise. In Toledo, a University of Puerto Rico student with a schizoaffective disorder brought an action under Title II of the ADA, alleging that the University and various officials discriminated against him based on and failed to reasonably accommodate his disability. See 454 F.3d at 224. In that case, the First Circuit considered the same factors considered in Lane to determine whether Title II is valid use of § 5 as applied to disability discrimination in public education:

> (1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations.

Id. at 34-35 (citing Lane, 541 U.S. at 522-23 (describing elements of test first established by the Supreme Court in City of Boerne v. Flores, 521 U.S. 507, 519 (1997)). The First Circuit determined that, as to the first factor, the Supreme Court has recognized the vital importance of all levels of public education. Id. at 36. Second, it found that there is a long history of disability discrimination in public education. Id. at 37-39. Lastly, it held that the provisions of Title II were a congruent and proportional response to the pattern of unconstitutional discrimination. Id. at 39-40. Thus, under Toledo, Title II of the ADA constitutes a valid exercise of Congress's § 5

Nonetheless, these claims are subject to dismissal as they have been brought outside the applicable statute of limitations. The ADA and Rehabilitation Act borrow the most analogous statute of limitations from state law. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 118 (1st Cir. 2003). In Massachusetts, that means applying the Commonwealth's three-year statute of limitations for personal injury claims. See Tassinari v. Salvation Army National Corp., 610 F. Supp. 3d 343, 358 (D. Mass. 2022); see also Verrier v. Beth Israel Deaconess Hospital-Plymouth, Inc., 706 F. Supp. 3d 142, 146 (D. Mass. 2023) ("The statute of limitations for ADA claims in Massachusetts borrows from the state statute of limitations for personal injuries which is three years."); Downs v. Mass. Bay Transp. Auth., 13 F. Supp. 2d 130, 136 (D. Mass. 1998) (applying Massachusetts' three-year statute of limitations for personal injury actions, M.G.L. c. 260, § 2A, to claims brought under Title II of the ADA and the Rehabilitation Act). Thus, because Morin filed this action on April 15, 2025, only conduct occurring after April 15, 2022 is actionable.

The discrimination in violation of the ADA and the Rehabilitation Act about which Morin complains occurred during his matriculation at QCC from September 4, 2019 to November 15, 2020. [Dkt. No. 93 at ¶¶ 1, 8-11]. Morin alleges Defendants failed to provide mandatory accommodations to which he was entitled for exams administered in 2020, thereby depriving him of an equal opportunity to demonstrate his academic competence. Id. at Count II, ¶ 8. Further, Morin alleges that Defendants criticized him for not taking the exams without accommodations and made disparaging remarks about his cognitive abilities and fitness for nursing. Id. at Count II, ¶¶ 8-10. Morin alleges that Defendants continued to discriminate

---

authority to enforce the Fourteenth Amendment as applied to cases implicating the right of access to public education. Id. at 40.

against him through their refusal to provide accommodations or grant him the academic credit and credentials he earned. Id. at Count II, ¶¶ 12-16.

The retaliation in violation of the ADA and Rehabilitation Act about which Morin complains occurred after he engaged in statutorily protected activity by bringing informal and formal complaints with HR and QCC's administration in May and June 2020, alleging disability-based unequal treatment by Professors Ricotta and Yoder. Specifically, Morin alleges that "[i]mmediately following Plaintiff's initial complaints in 2020, Defendants Ricotta and Yoder placed him on academic probation and subsequently dismissed him from the Practical Nursing Program on June 3, 2020, citing incomplete ATI exams – grounds later acknowledged by QCC officials as illegitimate." Id. at Count III, ¶ 4.

The statute of limitations bars these alleged acts of discrimination and retaliation because they occurred before April 15, 2022, and Morin does not argue otherwise. [Dkt. No. 99, p. 4]. Rather, Morin argues that his claims are timely first, under the discovery rule because the full extent of QCC's discriminatory conduct was not reasonably discoverable until June 8, 2023, when the restitution options that it offered revealed a pattern of retaliatory motive; second, because the statute of limitations should be equitably tolled; and third, because Defendants' conduct constitutes a continuing violation. Dkt. No. 93 at Count II, ¶¶ 17-18.

1. The statute of limitations is not tolled due to the discovery rule nor due to fraudulent concealment of Morin's cause of action.

Both state and federal case law require that a plaintiff have notice of the injury suffered and the identity of the person who caused that harm before a claim can accrue. Kim v. Lo, 769 F. Supp. 3d 41, 53 (D. Mass. 2025); see also Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 33 (1st Cir. 2015) (for federal and state discrimination claims, accrual occurs once a plaintiff experiences the "crystallized and tangible effect" of the discrimination and has "notice of both

the act and its invidious etiology"). This is known as the "discovery rule." See Ouellette v. Beaupre, 977 F.3d 127, 136 (1st Cir. 2020). Under the federal discovery rule, accrual begins only once a plaintiff "knows, or should know, ... of both the fact of his or her injury and the injury's likely causal connection with the putative defendant[.]" Id.; see also Harrington v. Costello, 467 Mass. 720, 727 (Mass. 2014) (under Massachusetts' discovery rule, "a cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that (1) he has suffered harm; (2) his harm was caused by the conduct of another; and (3) the defendant is the person who caused that harm"). Thus, tolling of the statute of limitations applies only where no "event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury." Kim, 769 F. Supp. at 53 (quoting Bowen v. Eli Lilly & Co., Inc., 408 Mass. 204, 205-06 (Mass. 1990)). In addition to the discovery rule (recognized both in Massachusetts and federally), M.G.L. c. 260, § 12 states: "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." M.G.L. c. 260, § 12.

The allegations in Morin's Second Amended Complaint undermine any claim that Morin had not timely discovered discrimination and retaliation he alleges, or that Defendants had deliberately concealed the consequent cause of action from him. Among other things, Morin's complaint alleges that he "was compelled to complete examinations without [his] accommodations" in 2020, see [Dkt. 93 at ¶ 10], and that "[o]n June 3, 2020, Defendant Ricotta dismissed [him] from the program via email[.]" Id. at ¶ 26. Further, Morin made contemporaneous complaints to QCC that described the alleged discrimination and retaliation.

Id. at ¶ 19 ("On May 8, 2020, the plaintiff reported this misconduct to Terry Vecchio, the Dean of Students, and Joanne Sharac, Coordinator of Student Accessibility Services, via email."); id. at ¶ 44 ("On June 16, 2020, the plaintiff, advised by his attorney, filed an affirmative action discrimination complaint against defendants Yoder and Ricotta with QCC's internal HR department."); id. at ¶ 29 (in June 2020, Morin retained counsel to assist his pursuit of his claims). Implicit in Morin's allegations and the steps he took to respond to alleged discriminatory and retaliatory conduct is Morin's notice of the injury suffered and the identity of the person who caused that harm. See Kim, 769 F. Supp. at 53.

As to M.G.L. c. 260, § 12, Morin has presented no evidence to suggest that Defendants "fraudulently conceal[ed]" his cause of action. See [Dkt. No. 93 at Count II, ¶ 18]; [Dkt. No. 99]. Accordingly, I recommend that Morin's federal discrimination and retaliation claims be dismissed on grounds of the statute of limitations.

2. Morin's claims do not qualify for equitable tolling.

Morin also asserts that the statute of limitations on these claims should be equitably tolled for the period that he was undergoing cancer treatment from 2020 to 2022 as his capacity to pursue legal remedies was impaired during that period. [Dkt. No. 93 at Count II, ¶ 18].

Equitable tolling is a doctrine which empowers a court to extend the limitations period for a particular action in appropriate circumstances. Martin v. Somerset County, 86 F.4th 938, 944 (1st Cir. 2023). However, equitable tolling is the exception, not the rule. Id. (citing Delaney v. Matesanz, 264 F.3d 7, 14 (1st Cir. 2001)). To obtain the benefit of equitable tolling, a plaintiff must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (internal quotations omitted). The First Circuit has described this as a "heavy

burden." Vazquez-Rivera v. Figeroa, 759 F.3d 44, 50 (1st Cir. 2014). In determining whether a plaintiff qualifies for equitable tolling courts ask "whether [a plaintiff's] physical conditions were severe enough to actually prevent [his] timely filing." LaRoe v. Division of L. Appeals BSEA, 793 F. Supp. 3d 373, 380 (D. Mass. 2025). The First Circuit has not expressly addressed whether or when medical conditions may qualify as extraordinary circumstances. See id. at 379. This Court has held that qualifying extraordinary circumstances existed where permanent quadriplegia prevented an incarcerated plaintiff from holding a piece of paper, writing with a pen, or hearing without lip reading, combined with plaintiff's unmet requests for assistance within the statute of limitation. Reaves v. Vidal, 2017 WL 975944, at *3 (D. Mass. Mar. 13, 2017).

Morin's Second Amended Complaint states only that "[b]etween January 2021 and June 2022, Plaintiff underwent intensive treatment for a previously diagnosed serious medical condition, which required full attention to his health and materially limited his ability to engage in or pursue academic or administrative matters with Quinsigamond Community College during that period." [Dkt. No. 93 at ¶ 56]. The conclusory allegation that Morin was "materially limited" from filing a claim is insufficient to establish that he was physically or mentally incapacitated to the point that he could not file a claim. See LaRoe, 793 F. Supp. 3d at 380. Further, it appears from the Second Amended Complaint that Morin had retained counsel in June 2020, which undermines the claim that initiation of a lawsuit depended exclusively on Morin. See Dkt. No. 93 at ¶ 29. Without more as to why Morin was unable to file this action, I recommend that the Court finds that Morin has not satisfied the heavy burden of equitable tolling. See Vazquez-Rivera, 759 F.3d at 50.

3. Morin's claims are not covered by the continuing-violations doctrine.

Morin also argues that his claims are not barred because his claims constitute violations which started in 2020 but continued through 2025 and are thus covered by the continuing-violation doctrine. [Dkt. No. 93, Count III at ¶ 16].

"[T]he continuing violations doctrine indisputably serves as an equitable means of ensuring that meritorious discrimination claims are not pretermitted because the claimant needed to experience a pattern of repeated acts before [they] could be expected to realize that the individual acts were discriminatory in nature." Rae v. Woburn Public Schools, 113 F.4th 86, 103 (1st Cir. 2024). The doctrine does not apply to discrete discriminatory acts which "do[] not require repeated conduct to establish an actionable claim." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009). The First Circuit has noted that "a denial of a disabled employee's request for accommodation starts the clock running on the day it occurs" because "such a denial is a discrete discriminatory act that, like a termination, a refusal to transfer, or a failure to promote, does not require repeated conduct to establish an actionable claim." Id. Where the continuing-violations doctrine does not apply, the timeliness of a plaintiff's claim "turns solely on whether an actionable denial of his request for accommodations occurred during the limitations periods." Id. at 130-31.

For the reasons discussed above, including Morin's actions in complaining in May and June 2020 of Ricotta's and Yoder's alleged disability-based unequal treatment, the filing of a formal complaint with HR, and the engagement of counsel, I find the alleged violations were discrete acts which took place in May and June of 2020. QCC's alleged failure to provide restitution options which were satisfactory to Morin or resolve the financial dispute surrounding billing for Anatomy & Physiology 102 does not restart the clock on Morin's discrimination and

retaliation claims because what he is alleging is merely Defendants' failure to adequately remedy their original offenses, all of which happened prior to April 15, 2022. See Dkt. No. 93 at Count II, ¶14-16, Count II, ¶ 13. Hence, Morin's claims do not allege continuing violations, and thus that the question of timeliness turns "solely on whether an actionable denial of his request for accommodations occurred during the limitations periods." Because all of Morin's requests for accommodations were made prior to April 15, 2022, I recommend that the Court find that they are barred by the applicable three-year statute of limitations.

## X. CONCLUSION

For the foregoing reasons, I recommend that Defendants' motion to dismiss [Dkt. No. 96] be allowed in its entirety.[10]

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

[10] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).